UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CASE NO. 04-11151-EFH

|  |  |
|---|---|
| DR. THOMAS J. WYLY, | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
|  | ) |
|  | ) |
| THE INTERNATIONAL | ) |
| FOUNDATION FOR EDUCATION | ) |
| AND SELF-HELP and THE LEON H. | ) |
| SULLIVAN FOUNDATION, | ) |
|  | ) |
| Defendants. | ) |
|  | ) |

## PLAINTIFF'S OPPOSITION TO THE
## LEON H. SULLIVAN FOUNDATIONS 'S MOTION TO DISMISS

Plaintiff, Dr. Thomas J. Wyly ("Dr. Wyly"), has commenced this action to recover

compensation due and owing for work done in connection with his role as National Director of

the Global Sullivan Principles ("GSP") Higher Education Campaign (the "Higher Education

Campaign") during 2002 and 2003. Authorized officers and directors of both defendants, The

International Foundation for Education and Self-Help ("IFESH") and The Leon H. Sullivan

Foundation ("The Sullivan Foundation"), repeatedly promised to pay Dr. Wyly for work

performed on behalf of the GSP Higher Education Campaign during 2002 and 2003. Such

promises, which neither organization kept, induced Dr. Wyly to continue to provide services to

IFESH and The Sullivan Foundation. The Sullivan Foundation has moved to dismiss Dr. Wyly's

claims, arguing that only IFESH, and not The Sullivan Foundation, may be held liable for the

compensation promised to Dr. Wyly.

Summary of Argument

The Sullivan Foundation argues that it had no contact or communication with Dr. Wyly in Massachusetts and that it made no promises or representations to Dr. Wyly in Massachusetts. The Sullivan Foundation also argues that it did not have any relationship with the GSP Program prior to August 1, 2003.

The Sullivan Foundation's arguments are unfounded. As the Affidavit of Plaintiff Thomas J. Wyly In Opposition To Defendant The Leon H. Sullivan Foundation's Motion To Dismiss ("Wyly Aff."), submitted herewith, amply demonstrates:

- Dr. Wyly held the position of National Director of the GSP Higher Education Campaign. His office, where he performed the substantial majority of his work, was located in Belmont, Massachusetts.

- The Sullivan Foundation, through its President, Hope Sullivan, and others promised to raise funds to compensate Dr. Wyly for his work. Hope Sullivan and Ralph Perkins, on behalf of The Sullivan Foundation, induced Dr. Wyly to continue his work for the GSP based on these promises of compensation.

- Hope Sullivan and Ralph Perkins of The Sullivan Foundation told Dr. Wyly in the spring of 2002 that The Sullivan Foundation had taken over responsibility for the GSP. Dr. Wyly received a public announcement dated May 13, 2002 stating that fact. Dr. Wyly, at Hope Sullivan's instruction, reported directly to Hope Sullivan at The Sullivan Foundation.

- The Sullivan Foundation, through its President, Hope Sullivan, and other representatives had numerous email exchanges, telephone calls and communications with Dr. Wyly in Massachusetts concerning the GSP and compensation owed to Dr. Wyly.

- Dr. Wyly relied on the promises and representations made by Hope Sullivan and others at The Sullivan Foundation to continue to work for the GSP Higher Education Campaign from his office in Massachusetts.

- Hope Sullivan and other representatives of The Sullivan Foundation were aware of, and approved of, Dr. Wyly performing his work for the GSP Higher Education Campaign from his office in Massachusetts.

Based on these facts, and the additional facts contained in Dr. Wyly's affidavit, The Sullivan Foundation's motion to dismiss Dr. Wyly's complaint for lack of personal jurisdiction should be denied.

The Sullivan Foundation has also moved pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss Dr. Wyly's claim under Massachusetts General Laws Chapter 93A. The Sullivan Foundation's motion is meritless and should be denied. Dr. Wyly alleges that The Sullivan Foundation, through its President and Chief Executive Officer, Hope Sullivan, wrongly induced his continuing performance by falsely promising that The Sullivan Foundation would raise funds to compensate him for his services. These statements and promises were deliberately false and misleading and constitute the type of unfair and deceptive acts or practices that are actionable under G.L. c. 93A. Dr. Wyly has amply satisfied his burden to state a claim at the pleading stage of this action.

<u>Facts</u>

The Global Sullivan Principles are an international code of ethical conduct developed by the Reverend Leon H. Sullivan. Reverend Sullivan initially developed these principles in 1977 as guidelines for corporations doing business in South Africa under the then-existing system of apartheid. With the dismantling of the apartheid system in South Africa, Reverend Sullivan worked to promote the GSP within corporate America and throughout the world. Reverend Sullivan also sought to expand the GSP into higher education. Reverend Sullivan retained Dr. Wyly as a consultant to assist in the higher education efforts. Wyly Aff., ¶¶ 12-13.

When Reverend Sullivan retained Dr. Wyly to assist in the higher education efforts, Dr. Wyly was a consultant to universities and colleges charging $1,200 per day for his services. Because he believed in and wanted to support Reverend Sullivan's mission, Dr. Wyly initially

charged only $250 per day for his services in promoting the GSP to educational institutions. Dr. Wyly's efforts were limited to a few days per month. Wyly Aff., ¶14.

In early 2001, Reverend Sullivan asked Dr. Wyly to lead the national GSP education campaign. He promised to pay Dr. Wyly a salary commensurate with salaries paid at colleges and universities. Dr. Wyly agreed to undertake this project, which meant that he would give up his consulting practice. Reverend Sullivan's initial budget for the GSP Higher Education Campaign reflected a salary for of $195,000 per year for Dr. Wyly. Wyly Aff., 15.

Reverend Sullivan died in April 2001. Hope Sullivan, Dr. C.T. Wright at IFESH, and others convinced Dr. Wyly to continue his work by promising him that he would be compensated in accordance with Reverend Sullivan's promises. In the fall of 2001, Dr. Wyly prepared a prepared a case statement and budget for the GSP Higher Education Campaign that included a salary of $120,000 per year and benefits of $42,000 per year for three quarters ($3/4^{th}$) of his time, which Hope Sullivan approved. Wyly Aff., ¶16.

Dr. Wyly's office was in Belmont, Massachusetts. His title, which was reflected on both his letterhead and his business cards, was National Director of The GSP Higher Education Campaign. Wyly Aff., ¶3. During his tenure as National Director of the GSP Higher Education Campaign, Dr. Wyly had numerous telephone conversations, email communications and correspondence with Hope Sullivan as President of The Sullivan Foundation and Ralph Perkins, Hope Sullivan's deputy, concerning the GSP, the Higher Education Campaign, and compensation due and owing to him. See, e.g., Wyly Aff., ¶¶3, 5, 50. These communications were received from and sent to Dr. Wyly's office in Belmont, Massachusetts. Hope Sullivan was fully aware that Dr. Wyly was domiciled in, and providing services from, his office in Belmont, Massachusetts. See, e.g., Wyly Aff., ¶3.

In February 2002, Hope Sullivan informed Dr. Wyly that effective immediately she was taking over the leadership of the GSP and that Dr. Wyly should report directly to her. Hope Sullivan also told Dr. Wyly that she intended to found a new organization, The Leon H. Sullivan Foundation, to raise funds for and administer the GSP (among other activities). Wyly Aff., ¶7. Thereafter, Dr. Wyly had numerous telephone conversations and email communications with Hope Sullivan and her deputy, Ralph Perkins, at The Sullivan Foundation concerning the GSP, Dr. Wyly's activities, and the compensation promised to him. See Wyly Aff., ¶ 3, 5, 50.

Hope Sullivan and Ralph Perkins of The Sullivan Foundation repeatedly informed Dr. Wyly that The Sullivan Foundation would raise funds for the GSP, including funds to compensate him for services performed at their request and with their approval. They touted the excellent financial prospects of The Sullivan Foundation as the new custodian of the GSP to secure his continuing services and to convince him to continue working despite having not been paid for services performed. Wyly Aff., ¶8. Many of these promises were made to Dr. Wyly in Massachusetts, and his work in reliance on those promises occurred primarily in Massachusetts. See, e.g., Wyly Aff., ¶¶3, 5, 9, 10.

On May 13, 2002, Hope Sullivan formally announced the creation of The Sullivan Foundation. Her memorandum states, "The Sullivan Foundation will also have direct responsibility for The Leon H. Sullivan Summit and The Global Sullivan Principles." (emphasis added). This is consistent with Hope Sullivan's previous statements to Dr. Wyly that The Sullivan Foundation would be in charge of the GSP. Wyly Aff., ¶22.

On May 18, 2002, Dr. Wyly sent from his home office in Belmont, Massachusetts, a strategy memorandum for the GSP Higher Education Campaign. In the memorandum, he confirmed that The Sullivan Foundation would administer the GSP, including the Higher

Education Campaign, and that the GSP would no longer be part of IFESH. The memorandum stated "Tom Wyly will always confer with The Sullivan Foundation staff about appropriate ways to connect the educations committee's plans and activities with those of the business and education campaigns." Hope Sullivan sent an email response to the memorandum stating, among other things, "Fabulous informative document. Thanks." and "Great document – very valuable." Wyly Aff., ¶¶24, 26.

On June 11, 2002, Dr. Wyly's co-chairs of the Higher Education Campaign, Nancy L. Zimpher of the University of Wisconsin-Milwaukee and Thomas R. Tritton of Haverford College, wrote to Hope Sullivan in her capacity as President of The Sullivan Foundation to address issues relating to his compensation. Their letter confirmed their understanding that, at that time, The Sullivan Foundation was the entity in charge of the GSP, including the Higher Education Campaign. Wyly Aff., ¶27. Shortly thereafter, on June 20, 2002, Dr. Wyly attended a GSP strategy session and Sullivan Foundation dinner in Washington, DC at the request of Hope Sullivan. During the dinner, Hope Sullivan announced that The Sullivan Foundation would raise funds for and assume the management of the GSP. Wyly Aff., ¶28.

Throughout April, May, June, July and August, 2002, Dr. Wyly had numerous telephone conversations with Hope Sullivan and Ralph Perkins of The Sullivan Foundation concerning the future direction of the GSP Higher Education Campaign, the organization of meetings and presentations for and on behalf of the Higher Education Campaign, and the compensation owed and promised to Dr. Wyly for both past and future work on behalf of the GSP. In August 2002, in conjunction with a conversation about fundraising and financial controls of The Sullivan Foundation, Hope Sullivan reiterated that she remained in control of the GSP and she again

promised Dr. Wyly that he would be paid for his past, present and future work for the GSP. Wyly Aff., ¶29.

On September 19, 2002, The Sullivan Foundation hosted a meeting of all parties concerned with the GSP. Dr. Wyly received the invitation to attend the meeting, and initiated and received several emails and telephone calls pertaining to the meeting, at his home office in Belmont, Massachusetts. Dr. Wyly prepared, from his home office in Massachusetts, a draft agenda for the meeting, and sent it to Hope Sullivan, among others. Dr. Wyly attended the September 19, 2002 meeting at the offices of The Sullivan Foundation in Washington, D.C. The attendees discussed the future of the GSP, and whether the GSP should remain with The Sullivan Foundation or be transferred back to IFESH. Wyly Aff., ¶¶31-32.

In October 2002, Dr. Wyly received notice that IFESH was resuming control over the GSP. Wyly Aff., ¶33. Thereafter, Dr. Wyly continued to work to advance the GSP. He continued to communicate frequently with Hope Sullivan at The Sullivan Foundation concerning his work and his need to be paid. See, e.g., Wyly Aff., ¶¶34, 37-41.

On April 2, 2003, a conference call was scheduled with IFESH, The Sullivan Foundation and Dr. Wyly. Hope Sullivan was to address the proposed role of The Sullivan Foundation in the GSP. Ultimately, Hope Sullivan did not participate in the call, but Julie Sullivan announced that IFESH and The Sullivan Foundation had agreed on a new approach to the GSP in which the two organizations would have joint responsibility for the GSP. Wyly Aff., ¶38. Shortly thereafter, on April 14, 2003, Dr. Wyly sent an email to Hope Sullivan discussing plans for the GSP, in which he stated, among other things, "You should be aware that if The Sullivan Foundation takes over the GSP, it's just a necessity that I get paid something toward back salary ASAP." Id., ¶39. In response, on April 15, 2003, Hope Sullivan sent Dr. Wyly an email to his

home office in Belmont, Massachusetts, stating, in part, "I agree that something must be done to compensate your time. And soon." At the time, Hope Sullivan was still President and CEO of The Sullivan Foundation. Id, ¶40.

On May 1, 2003, Andrew J. Young, Chairman of The Sullivan Foundation, announced the transfer of the GSP back to the Sullivan Foundation. In connection with the transfer, The Sullivan Foundation required indemnification from IFESH "against any existing or potential claims and liabilities relating to activities of IFESH and the GSP. . . ." Wyly Aff., ¶42.

On May 9, 2003, Dr. Wyly received an email from Hope Sullivan at his Massachusetts office stating <u>for the first time</u> that The Sullivan Foundation took the position that IFESH, and not The Sullivan Foundation, was solely responsible for the many financial commitments and promises made to him over the previous eighteen (18) months by representatives of both IFESH and The Sullivan Foundation. Wyly Aff., ¶44. In response, on May 12, 2003, Dr. Wyly sent an email to Hope Sullivan reminding her of the numerous representations made to him in 2002. He further reminded Hope Sullivan, "Of course, Ralph Perkins also confirmed, before, during, and after the June [2002] meetings, that with The Sullivan Foundation now in charge of the GSP, I could before long expect payment for all my past services on the GSP. In doing so, he was only reiterating, as you know, commitments you yourself had expressed to me on various occasions." He further stated:

> "At the end of the day, it is simply true that you, for a period of time, which at IFESH were in charge of the GSP, and that as the person in charge, you urged me to continue working on the education campaign, promising me that I would eventually be paid in full, and an appropriate level of compensation negotiated and paid. <u>It is also true that you reiterated this commitment once The Sullivan Foundation was created</u>, and you and Ambassador Young publicly announced that the Foundation had assumed responsibility for the GSP. It is also true that after June, <u>Ralph Perkins reiterated to me on your behalf that The Sullivan Foundation would pay me for all my past work on the GSP, and that you assured me that Ralph spoke for you regarding the GSP.</u> And it is also true that Dr. Wright [of

IFESH] has explained his inactivity regarding the GSP by indicating that you and Ambassador Young and The Sullivan Foundation had assumed complete responsibility for it, and that he was powerless to interfere with your management of the GSP."

Dr. Wyly continued as follows:

"It is simply incorrect, then, to say that you, as Sullivan Foundation president, had no role in negotiating compensation for me; rather, it is true that you entered into a negotiation process, committed to completing the process and paying me in full and then did not keep these commitments. If anything I have written here is factually inaccurate, please inform me what it is.

I find myself in the untenable position, then, of having been assured by both Dr. Wright, when he was in charge of the GSP, and by you, when you were in charge of the GSP, both at IFESH and at The Sullivan Foundation (or at least when I was led to believe that you were in charge of the GSP at The Sullivan Foundation), that I would be paid in full for all [my] labors. . . ."

Wyly Aff., ¶45 (emphasis added).

On July 7, 2003, Thomas Tritton, President of Haverford College and co-chair of the GSP Higher Education Campaign, wrote to Dr. Wright at IFESH as follows: "I am glad to know that IFESH and The Sullivan Foundation plan to make good on this debt as we owe Tom a great deal for all the good work he did at Reverend Sullivan's request." Wyly Aff., ¶46.

Argument

I.    THIS COURT HAS JURISDICTION OVER THE SULLIVAN FOUNDATION

Specific jurisdiction "depends on the relationship between the contacts giving rise to personal jurisdiction and the activities underlying the cause of action." Landmark Bank v. Machera, 736 F.Supp. 375, 379 (D. Mass. 1990). To establish personal jurisdiction over The Sullivan Foundation, Dr. Wyly must show that the Massachusetts long-arm statute grants jurisdiction and that the exercise of jurisdiction under the long-arm statute comports with the due process requirements of the Fourteenth Amendment. See Daynard v. Ness, Motley, Loadholt,

Richardson & Poole, P.A., 290 F.3d 42, 52 (1st Cir. 2002); Foster-Miller, Inc. v. Babcock &

Wilcox Canada, 46 F.3d 138, 144 (1st Cir 1995); Landmark Bank, supra 736 F. Supp. at 383.

The most conventional method for determining whether a plaintiff has met this burden is

the "prima facie" method, which "'permits the district court to consider only whether the

plaintiff has proffered evidence that, if credited, is enough to support findings of all facts

essential to personal jurisdiction.'" See Daynard, supra 290 F.3d at 50-51. Mr. Wyly has

proffered more than sufficient evidence in his affidavit to meet this burden.

A.    The Sullivan Foundation Is Subject To Jurisdiction Under The Massachusetts
      Long-Arm Statute

The Massachusetts Long-Arm Statute, M.G.L. c. 223A, § 3, states in relevant part:

A court may exercise personal jurisdiction over a person [which is defined to
include organizations such as The Sullivan Foundation, G.L. c. 223A, § 1], who
acts directly or by an agent, as to a cause of action in law or equity arising from
the person's

(a) transacting any business in this Commonwealth;

*      *      *

(c) causing tortious injury by act or omission in this Commonwealth; . . .

The making of promises to a person in the Commonwealth that are intended to and do

induce detrimental reliance by a person in the Commonwealth satisfies both sections of the

Massachusetts long-arm statute: (a) transacting any business in this Commonwealth; and (c)

causing tortious injury by act or omission in the Commonwealth.  See, e.g., Landmark Bank,

supra 736 F. Supp. at 384, quoting Murphy v. Erwin-Wasey, Inc., 406 F.2d 661, 664 (1st Cir.

1972) ("Where a defendant knowingly sends into a state a false statement, intending that it

should there be relied upon to the injury of a resident of that state, he has, for jurisdictional

purposes, acted within that state."); The Ealing Corp. v. Harrods Ltd., 790 F. 2d 978, 982-83 (1st

Cir. 1986) (holding that defendant that had no intention of following through on representation

made in a telex to a Massachusetts company is subject to personal jurisdiction under both §§3(a) and 3(c) of the Massachusetts long-arm statute); Burtner v. Burnham, 13 Mass. App. Ct. 158, 162-63 (1982) (holding that Massachusetts plaintiff who received erroneous statements from defendant both by telephone and mail established personal jurisdiction over out-of-state defendant).

Commencing in February 2002, Dr. Wyly reported directly to Hope Sullivan. See Wyly Aff., ¶¶6, 8, 19. In May 2002, Hope Sullivan, as President, and Andrew Young, Chairman of the Board, announced that The Sullivan Foundation has assumed responsibility for the GSP. Id., ¶22. At the time, Dr. Wyly was National Director for the GSP Higher Education Campaign, and his letterhead, business cards and promotional material all reflect the location of his office in Belmont, Massachusetts. See id., ¶3.

Throughout April, May, June, July and August, 2002, and thereafter, Hope Sullivan, as President and CEO of The Sullivan Foundation, and her deputy, Ralph Perkins, repeatedly promised compensation to Dr. Wyly to induce him to continue work to advance the GSP. See, e.g., Wyly Aff., ¶¶21, 29-30. Hope Sullivan and Ralph Perkins repeatedly promised Dr. Wyly that The Sullivan Foundation would raise money for the GSP to pay him for his work as National Director of the GSP Higher Education Campaign. Id., ¶29. Dr. Wyly relied on these promises to continue to work for the GSP Higher Education Campaign in his Belmont, Massachusetts office. See id., ¶¶2-3, 9.

Dr. Wyly communicated with Hope Sullivan, as President of The Sullivan Foundation, regarding both the GSP and compensation due and owing to him from his office in Massachusetts. See Wyly Aff., ¶¶3, 5. Dr. Wyly sent and received dozens, if not hundreds, of email messages and telephone calls to and from Hope Sullivan as President of The Sullivan

Foundation from his Massachusetts office. Id. Moreover, Dr. Wyly engaged in substantial business activities in Massachusetts on behalf of, and at the request of, The Sullivan Foundation, including meeting with and presenting the GSP to organizations representing the public and private colleges and universities in Massachusetts. Id., ¶9.

These facts, presented in Dr. Wyly's affidavit, state a claim against The Sullivan Foundation and satisfy the requirements for jurisdiction under the Massachusetts Long-Arm Statute.[1]

B.    The Due Process Clause Of The United States Constitution Does Not Prohibit The Exercise Of Jurisdiction Over The Sullivan Foundation

"Due process requires only that in order to subject a defendant to a judgment *in personam*, if he be not within the territory of the forum, he have certain minimum contacts with it such that maintenance of the suit does not offend traditional notions of fair play and substantial justice." Daynard, supra, 290 F. 3d at 52 (internal quotations omitted). Due process implicates three distinct components: relatedness, purposeful availment, and reasonableness:

> First, the claim underlying the litigation must directly arise out of, or relate to, the defendant's forum-state activities. Second, the defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable. Third, the exercise of jurisdiction must, in light of the Gestalt factors, be reasonable.

---

[1] The Massachusetts Superior Court addressed a motion to dismiss for lack of jurisdiction on similar facts in Abbott v. Interactive Computing Devices, Inc., 1998 WL 1182003 (Mass. Super. 1998) (Gants, J.) (a true and accurate copy is attached hereto as Tab A). That case involved promises by a corporate president or members of his staff to pay money to a consultant to a predecessor corporation. Plaintiff argued, similar to Dr. Wyly's claims here, that the promises of compensation induced him to continue to do work for the benefit of the successor corporation. On those facts, the Court concluded that jurisdiction was proper under the Massachusetts Long-Arm Statute, G.L. c. 223A, §§3(a) and (c) against the president (the corporation had withdrawn its motion to dismiss after oral argument). The Court also concluded that the exercise of jurisdiction did not offend due process ("Even if there were only a single telephone call with the plaintiff in Massachusetts, that telephone call concerned the possible continuation of work that [the president] understood would be performed in Massachusetts. This is sufficient to establish the necessary minimum contacts. . . .").

Foster-Miller, Inc., supra, 46 F. 3d at 144. The Sullivan Foundation's numerous contacts with the Commonwealth of Massachusetts, as set forth in Dr. Wyly's affidavit, satisfy the requirements of due process for the exercise of jurisdiction by the Court.

        1.    *Relatedness*

In establishing whether personal jurisdiction exists over a defendant for a claim of breach of contract, a court must look to the elements of the cause of action and ask whether the defendant's contacts with the forum were instrumental either in the formation of the contract or in its breach. Champion Exposition Services, Inc. v. Hi-Tech Electric, LLC, 273 F. Supp.2d 172, 177 (D. Mass. 2003). "[P]rior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing ... must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum." Id. (internal quotations omitted). In this case, The Sullivan Foundation's contacts with Dr. Wyly at his office in Massachusetts satisfy the relatedness prong of the analysis.

Dr. Wyly's claims against The Sullivan Foundation are directly based on the promises Hope Sullivan and Ralph Perkins made to Dr. Wyly in Massachusetts to induce him to continue his work for the GSP, most of which was performed at his Massachusetts office. See Wyly Aff., ¶2. They repeatedly promised him that The Sullivan Foundation would raise money to pay him. See, e.g., id., ¶¶7-9, 22. This suit follows The Sullivan Foundation's failure to meet those promises. Dr. Wyly's claims thus "directly arise out of, or relate to, the [Sullivan Foundation's] forum-state activities." See Daynard, supra, 290 F.3d at 61.

Moreover, Dr. Wyly performed services in Massachusetts for the GSP at the direction of Hope Sullivan, President of The Sullivan Foundation. See, e.g, Wyly Aff., ¶¶6-10, 22. Dr. Wyly was performing services for and on behalf of The Sullivan Foundation, which had

announced that it had taken over responsibility for the GSP. See id., ¶22. Dr. Wyly had
numerous conversations with and reported directly to Hope Sullivan, as President of The
Sullivan Foundation, from April through September of 2002. See, e.g., id., ¶¶5-6, 8, 21, 29-30.
Dr. Wyly's action arises directly from his reliance on The Sullivan Foundation's representations
to him in Massachusetts. For these reasons, Dr. Wyly's claims are directly based on The
Sullivan Foundation's contacts with him in Massachusetts.

       2.   *Purposeful Availment*

      The Sullivan Foundation's contacts with Massachusetts were purposeful, knowledgeable
and voluntary. See Nowak v. Tak How Investments, Ltd., 94 F.3d 708, 716 (1st Cir. 1996).
(purposeful availment factor requires that contacts with forum state be voluntary, that is "not
based on the unilateral actions of another party or a third person" and foreseeable such that it
should have "reasonably anticipate being haled into court"). In February 2002, Hope Sullivan
agreed that Dr. Wyly should maintain his office as National Director of the GSP Higher
Education Campaign in Massachusetts. See Wyly Aff., ¶¶18-19. Hope Sullivan directed Dr.
Wyly to report to her directly, which he did. See, e.g., id., ¶¶6, 10, 19. Hope Sullivan and
Andrew Young sent the May 13, 2002 announcement that The Sullivan Foundation would be
taking over the GSP. Id., ¶22. The Sullivan Foundation assumed control over the GSP with
actual knowledge that Dr. Wyly was the National Director of the GSP Higher Education
Campaign and that his office was in Massachusetts. Hope Sullivan and Ralph Perkins repeatedly
solicited Dr. Wyly's continued work in Massachusetts on behalf of the GSP Higher Education
Campaign, and they made repeated promises to Dr. Wyly while he was working in his office in
Massachusetts that The Sullivan Foundation would raise the money necessary to compensate him
for his efforts. See, e.g., id., ¶¶3, 5, 7-9, 19, 21, 29, 30, 32, 39-40.

The Sullivan Foundation's contacts with Dr. Wyly in Massachusetts were "intended to build and maintain a relationship with a Massachusetts [businessman], [and thus] rendered foreseeable the possibility of being haled into a Massachusetts court." Champion, supra 273 F. Supp.2d at 178 (holding that contractors' contacts with Massachusetts satisfied purposeful availment requirement). Based on these continued promises to Dr. Wyly, and its ultimate failure to follow through on such promises, The Sullivan Foundation should have foreseen being haled into Court in Massachusetts. See Nowak, supra, 94 F.3d at 716.

     3.    *Reasonableness*

"Personal jurisdiction may only be exercised if it comports with traditional notions of 'fair play and substantial justice.'" Nowak, supra, 94 F.3d at 717, quoting International Shoe Co. v. Washington, 326 U.S. 310, 320 (1945). Factors bearing on the fairness of subjecting a nonresident to a foreign tribunal include: "(1) the defendant's burden of appearing, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interest of all sovereigns in promoting substantive policies." Id., citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 477 (1985). A strong showing of reasonableness may serve to fortify a more marginal showing of relatedness and purposefulness. Id.

A review of these factors demonstrates that personal jurisdiction over The Sullivan Foundation comports with traditional notions of 'fair play and substantial justice." First, The Sullivan Foundation has failed to demonstrate that the "exercise of jurisdiction in the present circumstances is onerous in a special, unusual, or other constitutionally significant way." See Nowak, supra, 94 F.3d at 718 (defendant alleges nothing special or unusual about its

situation beyond ordinary cost and inconvenience of defending far from its place of business).

Hope Sullivan and The Sullivan Foundation are located in Washington, D.C. Thomas Wyly is in

Massachusetts. Other witnesses are located in Pennsylvania, Wisconsin, Georgia, and Arizona.

There is nothing especially unfair or onerous about proceeding with litigation in Massachusetts.

Second, Massachusetts has a strong interest in obtaining jurisdiction over a defendant that

causes injury to its citizens within its borders. See Nowak, supra, 94 F.3d at 718.

Massachusetts also has a strong interest in providing its citizens with a convenient forum in

which to assert their claims. Id. Given that the promises upon which Dr. Wyly relied, the work

performed in reliance on such promises, and the injury sustained as a result of The Sullivan

Foundation's failure to follow through on its promises, all occurred primarily in Massachusetts,

Massachusetts has a strong interest in exercising jurisdiction over The Sullivan Foundation. See

id. (holding that Massachusetts had strong interest in exercising jurisdiction over Hong Kong

corporation despite that injury occurred in Hong Kong).

Third, the Court must "accord [Dr. Wyly's] choice of forum a degree of deference in

respect to the issue of its own convenience . . . ." Foster-Miller, supra, 46 F.3d at 151. A

Massachusetts forum is most convenient for Dr. Wyly. The potential witnesses are scattered

throughout the United States and there is no central locus convenient for all parties. Dr. Wyly's

interest in bringing his action in Massachusetts, given the traditional deference accorded to

plaintiff's choice of forum, weighs in favor of exercising personal jurisdiction over The Sullivan

Foundation. Daynard, supra, 290 F.3d at 62.

Fourth, the efficient administration of justice requires that the Court exercise personal

jurisdiction over The Sullivan Foundation. This action is already proceeding against IFESH in

this Court. Consideration of judicial economy and efficiency counsel against splitting Dr.

{00008013.DOC / 2}                                      16

Wyly's claims into separate actions, particularly where The Sullivan Foundation defends on the basis that IFESH, and not The Sullivan Foundation, is responsible for the monies due and owed to Dr. Wyly.

Accordingly, the due process clause of the United States Constitution does not preclude Dr. Wyly's claims against The Sullivan Foundation from proceeding in Massachusetts.

### C.    The Sullivan Foundation's Factual Contentions Are Without Merit

The Sullivan Foundation argues that, "[t]he single contact that the LHS Foundation has had with anyone in Massachusetts was a single mailing to a few residents of the Commonwealth." Sullivan Foundation Brief, at p. 3. This argument is incorrect. Dr. Wyly bases his jurisdictional arguments on Hope Sullivan's and The Sullivan Foundation's specific the contacts with him, in Massachusetts, that underlie his claims. Hope Sullivan, as President and CEO of The Sullivan Foundation, contacted Dr. Wyly at his office in Belmont, Massachusetts, on numerous occasions by telephone, e-mail and regular mail. While in Massachusetts, Dr. Wyly received and sent hundreds of e-mail messages and telephone calls to officers and representatives of The Sullivan Foundation. As Hope Sullivan was aware, Dr. Wyly performed much of his work on behalf of the GSP at his office in Massachusetts. It is these contacts, not a single fund-raising mailing, upon which jurisdiction is rightfully exercised.

The Sullivan Foundation also argues that the GSP "had no connection to the LHS Foundation until August 1, 2003 . . . ." Sullivan Foundation's Brief, p.1. Again, this argument is incorrect on the facts:

- Hope Sullivan in February 2002 announced that she was the director of the GSP and that Dr. Wyly should report to her. Hope Sullivan also reported that she was founding a new entity to raise money for and to take over the GSP. Wyly Aff., ¶¶6-7.

- On May 13, 2002, Hope Sullivan formally announced that The Sullivan Foundation was taking over responsibility for the GSP. Hope Sullivan was the President of The Sullivan Foundation. Wyly Aff., ¶22.

- In June 2002, Hope Sullivan publicly announced at an annual Summit Dinner that The Sullivan Foundation had undertaken responsibility for The GSP. Wyly Aff., ¶28.

- In August 2002, Hope Sullivan confirmed that The Sullivan Foundation remained in charge of the GSP. Wyly Aff., ¶30.

- In September 2002, The Sullivan Foundation convened a meeting in Washington, DC, to discuss the future and direction of the GSP. Wyly Aff., ¶31.

- Throughout the spring, summer, and fall, 2002, Dr. Wyly continued to report directly to Hope Sullivan as President of The Sullivan Foundation. See, e.g., Wyly Aff., ¶19-29.

- Throughout the spring, summer, and fall, 2002, Dr. Wyly had numerous conversations and communications with Hope Sullivan, Ralph Perkins and others at The Sullivan Foundation concerning the GSP. See, e.g., Wyly Aff., ¶19-29.

As the foregoing demonstrates, The Sullivan Foundation repeatedly represented that it was in charge of the GSP and acted accordingly, which belies its current contention that it had no relationship with The GSP prior to August 2003.

The Sullivan Foundation argues that it had made no contract, agreement or promise to Dr. Wyly. Sullivan Found. Brief, p.8. Yet as Dr. Wyly's affidavit and attached documentation demonstrates:

- Hope Sullivan, as President and CEO of The Sullivan Foundation, promised that The Sullivan Foundation would secure the funds necessary to compensate Dr. Wyly. See, e.g., Wyly Aff., ¶2, 8.

- Dr. Ralph Perkins, Hope Sullivan's deputy at The Sullivan Foundation, repeatedly promised Dr. Wyly that he would be paid for his past, present and future work for and on behalf of GSP. See, e.g., Wyly Aff., ¶2, 8.

- Hope Sullivan, Ralph Perkins, and others told Dr. Wyly that The Sullivan Foundation was in charge of the GSP and would compensate him for his

work for the purpose of inducing Dr. Wyly to continue to perform services for the GSP. See, e.g., Wyly Aff., ¶¶6-8.

- Dr. Wyly agreed to continue his work on the GSP in reliance on Hope Sullivan's promise that The Sullivan Foundation would pay him for his work. Wyly Aff., ¶¶2, 9.

- The Sullivan Foundation received the benefits of Dr. Wyly's work for the GSP.

Given these facts, The Sullivan Foundation's efforts to divorce itself from Dr. Wyly's role as National Director of the GSP in order to evade personal jurisdiction is unavailing.

For these reasons, based on the facts presented in Dr. Wyly's affidavit, The Sullivan Foundation's motion to dismiss for lack of jurisdiction should be denied.

## II.     PLAINTIFF HAS STATED A COGNIZABLE CLAIM UNDER G.L. c. 93A

The Sullivan Foundation attempts to recast the allegations of the Complaint as a run-of-the-mill breach of contract claim and, as recast, to dismiss the c. 93A claim. However, as the Complaint alleges:

¶13    Ms. Sullivan and Dr. Wright repeatedly promised Dr. Wyly compensation for his work and reimbursement for the GSP Higher Education Campaign expenses that he advanced, with the deliberate intention and effect of causing Dr. Wyly to continue to lead the GSP Higher Education Campaign

¶14    Dr. Wyly questioned Ms. Sullivan and Dr. Wright about the fact that he had not been paid for his services. They consistently encouraged him to persist in leading the GSP Higher Education Campaign and promised to reimburse him for all past earnings and expenses and to compensate him for his continued work.

¶15    Ms. Sullivan personally assured Dr. Wyly that the debt owed to him would be satisfied in full. She even wrote to Dr. Wyly that she agreed that he had to be compensated, "and soon."

Despite having acknowledged the debt, and promising to satisfy their obligations to Dr. Wyly, IFESH and The Sullivan Foundation have refused to pay Dr. Wyly amounts due and owing in disregard of their known obligations. This is precisely the type of claim contemplated

by G.L. c. 93A. See Anthony's Pier Four, Inc. v. HBC Assoc, 411 Mass. 451, 451 (1991)

("[w]e have said that conduct 'in disregard of known contractual arrangements' and intended to

secure benefits for the breaching party constitutes an unfair act or practice for c. 93A

purposes.'").

This is not a case in which there exists a dispute about one's contractual obligations, as

The Sullivan Foundation contends. Rather, this is a case in which IFESH and The Sullivan

Foundation repeatedly promised to compensate Dr. Wyly for his work so that he would continue

to provide valuable services, without any intention of following through on such promises. This

is an unfair business practice cognizable under G.L. c. 93A. See also Greenstein v. Flatley, 19

Mass. App. Ct. 351, 356-357 (1985) (intentional action calculated to mislead plaintiff despite

plaintiff's "predictable reliance on the existence of a deal" constitutes a violation of G.L. c.

93A).

Conclusion

For the foregoing reasons, plaintiff Dr. Thomas J. Wyly respectfully requests the Court to

deny The Leon H. Sullivan Foundation's Motion to Dismiss.

DR. THOMAS J. WYLY,

By his attorneys,

David A. Brown, BBO# 556161
Pamela A. Zorn, BBO# 640800
SHERIN AND LODGEN LLP
100 Summer Street
Boston, Massachusetts  02110
(617) 646-2000

Dated:  June 21, 2004

## Certificate of Service

I hereby certify that on this day a true copy of the above document was served upon the attorney of record for each party by mail.

June 21, 2004                              .            _David A. Brown_